IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

FILED
CLERKS OFFICE
2011 NOV 30 P 6: 36
U.S. DISTRICT COURT
DISTRICT OF MASS.

| | |
|---|---|
| JAMES M. ATKINSON, pro se<br><br>Plaintiff,<br><br>v.<br><br>TOWN OF ROCKPORT, et al.,<br><br>Defendants. | 11-CV-11073-NMG<br><br>PLAINTIFF'S MEMORANDUM OF LAW RE: RESEARCH ELECTRONICS, LLC "STATEMENT OF MATERIAL FACTS (DOCKET NO. 13)" AND PERTINENT MATERIALS. |

**PLAINTIFF REQUESTS ORAL ARGUMENT ON THIS MATTER**

1. An "End User Certificate" is a letter or other document that is issued by the intended person or agency (in this case in intelligence agency) certifying that they are the intended final user of the product, service, information, or other goods. This certification is required to obtain proper licenses to facilitate legal and lawful exportation as these goods are considered dual use arms, an under international treaty they must be license by the diplomatic authorities in a given country. In the case of the United States this license is issued by the PM/DDTC office within the U.S. State Department, and it can be issued by no other

| | |
|---|---|
| 17 | element of the U.S. Government. The end user certificate initiates the |
| 18 | issuance of the "End User License" and this license number has to be |
| 19 | placed on all exportation documents. As the goods themselves are not |
| 20 | only controlled, but also the software, manuals, books, training, |
| 21 | consulting, and technical details then licenses but also be obtains for |
| 22 | these as well, when they are sought prior to the actual final transaction. |
| 23 | Additionally, each entity which brokers the transaction, or which |
| 24 | handles the goods must also be cleared by the PM/DDTC so it is |
| 25 | customary to drop ship these types of goods right from the factory, |
| 26 | directly to the ultimate end user. On a legitimate transaction, these end |
| 27 | user letters or certificates are vital to comply with international treaty. |
| 28 | |
| 29 | 2. Exports of this type of equipment require a great deal of effort to get |
| 30 | approved, once the end user certificate of letter gets issued, and before |
| 31 | a legal and legitimate export may actually take place. |
| 32 | |
| 33 | 3. Further, as this equipment REQUIRES a formal license from the U.S. |
| 34 | State Department the presentation of the End-User Letter initiated the |
| 35 | second stage of end-user licensing, which would normally take at least |
| 36 | a few weeks, but more often months for the State Department to |

| | |
|---|---|
| 37 | approve both the broker (in Switzerland), and the actual end user (in |
| 38 | Uzbekistan). |
| 39 | |
| 40 | 4. A "SED" is a Shipper's Export Declaration (SED) filing is required by |
| 41 | the U.S. Census Bureau for U.S. exports that contain a single |
| 42 | commodity's value exceeding a certain dollar amount (currently |
| 43 | $2500). All SED information is provided to the U.S. Census Bureau |
| 44 | and is used for export compliance and governmental reporting. |
| 45 | |
| 46 | 5. The "Shipper's Export Declaration (SED)" contains a section in which |
| 47 | the PM/DDTC license number that was issued by the U.S. State |
| 48 | Department must be placed, and on the current "FORM 7525-V(7-18- |
| 49 | 2003)" used by the U.S. Census Bureau this section is labeled "27. |
| 50 | LICENSE NO./LICENSE EXCEPTION |
| 51 | SYMBOL/AUTHORIZATION" In the event of a fraudulent |
| 52 | exportation of these goods the block or section will list "NLR" or "No |
| 53 | License Required" when it should in fact contain the actual license |
| 54 | number required by law. |
| 55 | |

6. An "ITAR License Number" refers to the actual license number issued by the Directorate of Defense Trade Controls (DDTC) of the U.S. State Department, in accordance with 22 U.S.C. 2778-2780 of the Arms Export Control Act (AECA) and the International Traffic in Arms Regulations (ITAR) (22 CFR Parts 120-130). More specifically, these type of goods are tightly controlled by "Division IV - Electronic Systems (USML Commodity Category XI)" within the office of PM/DDTC of the U.S. State Department. TSCM equipment, goods, services, training, manuals, and technical data may not leave this country unless a license is first obtain from this division, each time. This permission in initiated by the aforementioned "End User Certificate" on application to the U.S. State Department.

7. An "ECCN" or "Export Control Classification Number" is an alpha-numeric code, e.g., 3A001 that describes the item and indicates licensing requirements. All ECCNs are listed in the Commerce Control List (CCL) (Supplement No. 1 to Part 774 of the EAR). The CCL is divided into ten broad categories, and each category is further subdivided into five product groups. These ECCN's are self-assigned by the manufacture of the goods, and not by the government. Thus, a

76   company who wishes to illegally export arms will assign to their
77   products an ECCN that is fraudulent in an attempt to evade and
78   subvert export controls.
79
80   8. The Department of Commerce's Bureau of Industry and Security
81   (BIS) is responsible for implementing and enforcing the Export
82   Administration Regulations (EAR), which regulate the export and
83   reexport of most commercial items. The U,.S. Government often refer
84   to the items that BIS regulates as "dual-use" – items that have both
85   commercial and military or proliferation applications – but purely
86   commercial items without an obvious military use are also subject to
87   the EAR.
88
89   9. The EAR do not control all goods, services, and technologies. Other
90   U.S. government agencies regulate more specialized exports. For
91   example, the U.S. Department of State has sole authority over defense
92   articles and defense services. A list of other agencies involved in
93   export controls can be found at Resource Links or in Supplement No.
94   3 to Part 730 of the EAR.
95

10. Thus, an ECCN is published by the Department of Commerce's Bureau of Industry and Security (BIS) with a description of what that ECCN means. Then the producers or manufactures of the goods match their products up with these descriptions (when it is legal for them to do so).

11. However, Export Administration Regulations (EAR) do not apply to commodities, goods, products, or services defined by international treaty as "dual use" items, and thus Department of Commerce has no authority over them, only the U.S. State Department.

12. Then under ITAR 121.1 XI(b), the use an ECCN code to then facilitate the exportation of a device, good, commodity, service, manual, or training that is used to "...electronic systems or equipment designed or modified to counteract electronic surveillance or monitoring" is unlawful as the goods sold by Research Electronics are sold for this purposes of "counteracting electronic surveillance or monitoring" as defined in their own textbooks, technical manuals, marketing materials, trade show presentations, and other documents. The use of an ECCN to export TSCM goods such as those

manufactured and exported (illegally) by Research Electronics is a fraudulent tactic to facilitate unlawful exportation and smuggling of arms.

13. Further, under ITAR Section 120.21, technical data, technical manuals, users guides, white papers, and other documents and descriptions are further restricted and controlled, and merely to send a users manual to a prospective overseas purchaser requires formal U.S. State Department Approval and the form of an End User License. The shipping of a manual to an overseas location, absent this permission by the U.S. State Department would thus be an illegal export, and defacto arm smuggling.

14. Training services on this equipment, and on this subject matter is also controlled under ITAR Section 120.8, and also controlled exclusively by the U.S. State Department, and a the student and the course must both obtain a license for the student to attend training in the United States, or for the U.S. based instructor to travel overseas to teach. Any teaching of the subject of TSCM or related disciplines to non-U.S. citizens is a very serious criminal act, unless permission is obtained

| | |
|---|---|
| 136 | for each student, each instructor, and each class. Research Electronics |
| 137 | and the employees and agents of Research Electronics has been |
| 138 | providing this unlawful training to non-U.S. Citizens. |
| 139 | |
| 140 | 15. Further, under "The Wassenaar Arrangement On Export Controls For |
| 141 | Conventional Arms and Dual-Use Goods and Technologies" or |
| 142 | merely "Wassenaar Arrangement" the United States is obligated |
| 143 | though the PM/DDTC office within the U.S. State Department to |
| 144 | administer a "dual use" licensing program. This office is thus |
| 145 | responsible for the regulation, licensing, enforcement, and control of |
| 146 | any such devices, equipment, good, information, or training related to |
| 147 | these subject matters. |
| 148 | |
| 149 | 16. The Participating States of the Wassenaar Arrangement are: Argentina, |
| 150 | Australia, Austria, Belgium, Bulgaria, Canada, Croatia, Czech |
| 151 | Republic, Denmark, Estonia, Finland, France, Germany, Greece, |
| 152 | Hungary, Ireland, Italy, Japan, Latvia, Lithuania, Luxembourg, Malta, |
| 153 | Netherlands, New Zealand, Norway, Poland, Portugal, Republic of |
| 154 | Korea, Romania, Russian Federation, Slovakia, Slovenia, South |
| 155 | Africa, Spain, Sweden, Switzerland, Turkey, Ukraine, United |

156 Kingdom and United States. Representatives of Participating States
157 meet regularly in Vienna where the Wassenaar Arrangement's
158 Secretariat is located.
159
160 17. The Wassenaar Arrangement has been established in order to
161 contribute to regional and international security and stability, by
162 promoting transparency and greater responsibility in transfers of
163 conventional arms and dual-use goods and technologies, thus
164 preventing destabilising accumulations. Participating States seek,
165 through their national policies, to ensure that transfers of these items
166 do not contribute to the development or enhancement of military
167 capabilities which undermine these goals, and are not diverted to
168 support such capabilities.
169
170 18. The decision to transfer or deny transfer of any item is the sole
171 responsibility of each Participating State. All measures with respect to
172 the Arrangement are taken in accordance with national legislation and
173 policies and are implemented on the basis of national discretion and
174 laws.
175

19. In the case of the Wassenaar Arrangement, the U.S. Statute which enforces it is "Title 22--Foreign Relations, Chapter I - Department Of State, Part 121 - The United States Munitions List." [CITE: 22 CFR 121.1] All other U.S. laws on the exportation of these dual-use items then derives from 22 CFR 121.1.

20. As part of the Wassenaar Arrangement, there is also a "List Of Dual-Use Goods and Technologies and Munitions List" from which the United States Munitions List is thus derived. See Page 177 of WA 10 29 201 (http://www.wassenaar.org/controllists/2010/WA-LIST%20%2810%29%201%20Corr/WA-LIST%20%2810%29%201%20Corr.pdf)

21. Under the Wassenaar Arrangement, "Munitions List" ML11.
   ML11. Electronic equipment, not specified elsewhere on the
   Munitions List, as follows, and specially designed components
   therefor:
       Electronic equipment specially designed for military use;
   Note ML11.a. includes:
       Electronic countermeasure and electronic counter-
       countermeasure equipment (i.e., equipment designed to
       introduce extraneous or erroneous signals into radar or radio
       communication receivers or otherwise hinder the reception,
       operation or effectiveness of adversary electronic receivers
       including their countermeasure equipment), including jamming
       and counter-jamming equipment;

```
202          Frequency agile tubes;
203          Electronic systems or equipment, designed either for
204          surveillance and monitoring of the electro-magnetic spectrum
205          for military intelligence or security purposes or for
206          counteracting such surveillance and monitoring;
207          Underwater countermeasures, including acoustic and magnetic
208          jamming and decoy, equipment designed to introduce
209          extraneous or erroneous signals into sonar receivers;
210          Data processing security equipment, data security equipment
211          and transmission and signalling line security equipment, using
212          ciphering processes;
213          Identification, authentification and keyloader equipment and
214          key management, manufacturing and distribution equipment;
215          Guidance and navigation equipment;
216          Digital troposcatter-radio communications transmission
217          equipment;
218          Digital demodulators specially designed for signals
219          intelligence;
220          "Automated Command and Control Systems".
221
222      N.B. For "software" associated with military "Software" Defined
223      Radio (SDR), see ML21.
224
225      b. Global Navigation Satellite Systems (GNSS) jamming equipment.
226
227
228  22. As a result, any improper exportation or importation of "Electronic
229      systems or equipment, designed either for surveillance and monitoring
230      of the electro-magnetic spectrum for military intelligence or security
231      purposes or for counteracting such surveillance and monitoring;" is
232      both a violation of U.S. Law, and a violation of International Treaty
233      which makes a United States of America liable to sanctions for such
234      violations. Essentially, an improper export of this type of equipment is
```

235  a grave diplomatic violation. Thus, there is an intricate protocol to
236  facilitate such sales, services, goods, information, and training so as
237  not to offend this international treaty.
238
239  23. In 1990, in the wake of the 1989 Tiananmen Square crackdown in
240  China, Congress passed legislation to reinforce interim economic and
241  diplomatic sanctions that President George H.W. Bush had
242  implemented earlier to express U.S. disapproval of the Chinese
243  government's actions. The "Tiananmen Square sanctions", as they are
244  popularly called, included: a continuance of the suspension of export
245  licensing for defense articles and defense services on the U.S.
246  Munitions List, a suspension of export licenses for crime control and
247  detection instruments and equipment; and related prohibitions.  It is
248  possible to export these items to China, but the PM/DDTC office at
249  the U.S. State Department is not allowed to issue such a license on
250  their own, such a license by only issue forth from the President of the
251  United States, and form no less authority. The President thus issues
252  the license, to the State Department, who then issues the End-user
253  License to the exporter who will be sending these types of goods to
254  China. It is a very serious criminal act to export TSCM or electronic

counter-measures equipment such as that made by Research Electronics, unless the President of the United States issues permission for the export. To date, Research Electronics International has ever applied for such a Presidentially issued license, and yet they have repeatedly exported arms illegally to China, repeatedly. Yet, Research Electronics has repeatedly claimed that they possessed such a license, when in fact they did not.

24. Congress passed sanctions against the People Republic of China in response to Tiananmen, including the Foreign Relations Authorization Act for Fiscal Years 1990 and 1991, which, among other things, required a presidential "national interest" determination, or waiver, for the export of a TSCM or Electronics Counter Measures equipment. There have been only 13 such Presidential "national interest" determinations pursuant to the Tiananmen sanctions legislation.

25. The U.S. Government controls the export and import of "defense articles" and "defense services" pursuant to the Arms Export Control Act. Section 38 of the Arms Export Control Act authorizes the

274 President to control the export and import of defense articles and
275 defense services.
276
277 26. The statutory authority of the President to promulgate regulations with
278 respect to exports of defense articles and defense services was
279 delegated to the Secretary of State by Executive Order 11958, as
280 amended.
281
282 27. The Arms Export Control Act is implemented by the International
283 Traffic in Arms Regulations (ITAR), which are administered by the
284 State Department's Office of Defense Trade Controls within the
285 Bureau of Political-Military Affairs. These regulations are found at 22
286 CFR parts 120-130.
287
288 28. The Arms Export Control Act provides that the President shall
289 designate the articles and services that are deemed to be "defense
290 articles" and "defense services." These items, as determined by the
291 State Department with the concurrence of the Department of Defense,
292 are included on the U.S. Munitions List.
293

29. No items may be removed from the U.S. Munitions List without the approval of the Secretary of Defense, and there must be 30 days advance notice to Congress.

30. The Department of Commerce or another department or agency may request a pre-license check to establish the identity and reliability of the recipient of the items requiring an export license.

31. The 1979 Act provides that the Secretary of Commerce and designees (U.S. State Department) may conduct overseas pre-license checks and post-shipment verifications of items licensed for export. A pre-license check is conducted during the normal licensing process. A post-shipment verification is an on-site visit to the location to which the controlled item has been shipped under an export license, in order to ascertain that the item is being used by the appropriate end user and for the appropriate purpose

32. The Commerce Department's and U.S. State Department procedures for conducting pre-license checks and post-shipment verifications are similar.

33. A pre-license check or post-shipment verification is initiated by sending a cable with relevant information about the case to the appropriate U.S. Embassy overseas. Specific officials at the Embassy usually have been pre-designated to conduct these checks, although special teams from Washington, D.C. also periodically conduct end-use checks.

34. The Embassy official initially collects background information on the end user (listed in the end user certificate). Next, the Embassy official visits the end user and interviews senior employees there. Upon completing the visit, the Embassy official is required to cable the Commerce Department or the U.S. State Department PM/DDTC with the information collected and an evaluation as to whether the proposed end user is considered a reliable recipient of U.S. technology.

35. Based on the cabled information, the cognizant agency evaluates whether the result of the check is favorable or unfavorable, and the license is issued or declined.

36. Research Electronics kept claiming that they had a license to export these goods, and when Plaintiff shared his concerns with FBI/DHS about REI possibly smuggling arms and that he was concerned because they (REI) kept claiming that they had such a license, but that Plaintiff had obtained several REI completed SED forms by accident which contained no ITAR license number, but did include an ECCN (hence, it was unlikely a legitimate exports).

37. Research Electronics has subverted U.S. Arms Export Laws, and confected a suit in early 2011 for improper purposes, and merely to harass and annoy the Plaintiff, all the while REI was engaging is illegal arm smuggling, and actively trying to desttoy the Plaintiff as a witness to the Arms Smuggling (which the Defendant REI discover had been reported to the authorities by the Plaintiff). Thus, the efforts to file so called "Materials Facts" in this matter by REI is nothing more then a smoke screen for arm smuggling, and an attempt to intimidate and manipulate a witness.

## CONCLUSION

1. Defendant Research Electronics, *et al.* has engaged is a complex criminal enterprise in order to smuggle arms in contravention of U.S. and International treaty, and working with other did confect a conspiracy to deprive the Plaintiff of his civil rights.

2. The conduct of the Defendant utterly shocks the conscience, and endangers national security, and destabilized international security.

Respectfully submitted,

Dated: November 30, 2011

*/s/*

James M. Atkinson, pro se
31R Broadway
Rockport, MA 01966
(978) 546-3803

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed though the ECF System will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) (by way of the clerks terminal) and paper copies by U.S. Mail will be sent to those indicated as non-registered participants this 30th day of November, 2011

*/s/*

James M. Atkinson, pro se

*Atkinson v. Town of Rockport, et al* 11cv11073-NMG   Page 18 of 18
Plaintiff's Opposition to Defendants Motion to Dismiss